We'll turn now to the third case on the argument calendar for today, which is 21-513, Henkin v. the bank, I'm not going to try to pronounce it. And Mr. Pincus, I see that you would like to reserve two minutes for rebuttal, is that right? Yes, Your Honor. Okay. Please proceed whenever. Good morning and may it please the court, Andrew Pincus for appellant. This court has assessed JASTA aiding and abetting claims in multiple cases. Under these precedents, the allegations here fall clearly on the insufficient side of the line and the action should be dismissed. The motion below was based on the fact that the bank had to actually know that ship has sailed. That ship has sailed, but the— Kahneman and Kaplan before it took care of that. So on the basis of which you moved in front of Judge Kogan, how is Judge Kogan's decision wrong? Because you asked him to dismiss based on actual knowledge. Well, Judge Kogan obviously— And that's the question that was certified to us, actual knowledge. That ship, as you have agreed with me, has sailed. Why should we even entertain this appeal? Well, the grant of interlocutory appeal brings up the order— Sure, it was because the question of importance for which—and the issue was, does actual knowledge—is actual knowledge required? That ship has sailed. Your Honor, I think respectfully a couple of things. First of all, the order brings up the underlying order, not a particular question. So the court can address anything involving the order and our submission is several fold as to why the court should address the questions here. First of all, there was a question in the district court about what facts could be considered in determining knowledge. That question still exists with respect to what facts, allegations in the complaint can be considered with respect to general awareness. Actual knowledge is a question of whether they knew or should have known is for trial. For the fact that there's general press stories, Honickman says okay. The problem in Honickman is that all the press stories came after the fact. Yes, but Honickman also said that what was critical in the complaint was first of all to assess the allegations respecting public sources for the information. This complaint is significantly deficient with respect to public sources for the information that is alleged. And Honickman and Kaplan said the second question is looking at that group of allegations for which there are sufficient public sources. Do they plausibly allege that the customers were, as the court put it, so closely intertwined with Hamas' violent activities that it's plausible to infer that the bank was generally aware that its provision of services meant it was playing a role in the terrorists' unlawful activities. And we think this submission here, the allegations are dramatically different from Kaplan. In Kaplan, the court relied on three particular kinds of facts that were supported by public sources. Kaplan was an easy case. There's Kaplan and there's Honickman. I think one of the reasons we think the court should decide this case is because there are a dozen cases pending in the lower courts. They could use more guidance. This is somewhere in between the two. Well, I think it's much closer to Honickman, of course I do, but it's very different from Kaplan and that's why we think that it would be very useful for the court to give guidance. If we accept your point that it would be helpful, I'm sure. Would it also be helpful for us to certify in every one of those and keep going for three or four more until we really nail down? I mean, we generally don't review cases like this. I mean, this comes up on a certified question. It's very unusual. And I understand the idea that we generally say, well, maybe in the very beginning when we have a relatively new statute, maybe we wind up deciding a few. Certainly, if it's granted the motion to dismiss, then it comes before us as a final judgment. We establish a few guideposts. This is an unusual circumstance, but how many more of these should we grant? If the district courts, I don't know, if there are three or four more where they refuse to deny and say, no, we're going forward with trials. Should we keep grabbing them just because what? What's the- Two points. I think two- Because there's a big dollar amount maybe in the end who damages? I think two points, Your Honor. I think, first of all, these arguments about the fact that Kaplan and Honecker went around to resolve the actual knowledge were made to the motions panel. The motions panel rejected them. Second of all, this is a case where the court and the parties have invested the resources to brief it. So in this situation, maybe granting 1292Bs is a place to cut it off. But with this case before the court and raising somewhat different questions- Judicial economy. Judicial economy and the parties' economy makes sense for the court to go ahead and resolve it and provide guidance, given the fact that there are these at least a dozen cases pending. So, as I said, three critical differences from Kaplan. There, the FTO, through a variety of public sources, TV stations, websites, acknowledged its relationship with the customers. The bank knowingly violated regulations with respect to these customers, giving them- those customers giving them special treatment. And then, most significantly, there were more than a dozen English-language articles, the court said, connecting one of the customers with payments of subsidies to the family of terrorists. I guess my question is, is that really the way we compare cases? I mean, in any case, do we say, we affirmed in some case that had X amount of strong evidence. We don't do that, say, with a bank robbery and say, well, there was videotape in that case. Well, there's no videotape here, not good enough. We don't measure the sufficiency of allegations or evidence from some other case and say, well, it had strong evidence. How close are you to it? We try to identify the threshold and ask, have you succeeded in exceeding the threshold? So I guess I don't see the utility of comparing it to Kaplan so much as maybe Honickman in saying, if you couldn't reach it in Honickman, you're lower. So I get that, right? Right. That was below the threshold. And if this case is below Honickman, a fortiori, you're below the threshold. So let me turn to the actual allegations, because I think that's the best way to look at it and compare it to- Let me just say- Distinguishing as among the customers. Yes. Because I don't think the customers are necessarily similarly- I think it has to be customer by customer, Your Honor, and I'd like to start with the foundation. I- And let me just say one thing. I see your yellow light is on. And for both sides, I foresee this case going well beyond the red light. So we'll tell you all when to stop, and we'll just make sure that you each get an equal amount of time. So don't worry too much about that. Thank you, Your Honor. So starting with the foundation, IHH, the principal allegation relied on is Israel's designation of it as a terrorist organization. But there is no allegation in the complaint of how, when, and whether that information was publicized to support general awareness. And it's very similar to footnote 20 in Honickman, where the court said a similar designation without allegation of public availability was insufficient. There's a second designation- But let's put this in context, too. This is operating in Turkey, which recognizes Hamas and has regular relationships with Hamas. Indeed, the President of Turkey meets regularly with representatives of Hamas, right? Yes, Your Honor. It's in a community that embraces Hamas. Yes, but I don't think we would say that Turkey is an illegitimate country, and Honickman involves Lebanon- I don't say it's an illegitimate country, I'm examining the record, that's all. And Honickman involved Lebanon, which obviously there are allegations, is actually the government is run by Hamas, so similar. And in Honickman, the court, as I said in footnote 20, said we really can't rely on that allegation. There's a second- Can I just pause on this point since we're talking about the designation? The district court, I think, looked at a link and said that this was quite well publicized. I understand you may be disputing whether it's allowed to take judicial notice. But I guess thinking big picture with this, if that's the only flaw and we sort of know that it's out there, it seems like if this point were the tipping point of whether it cuts over the threshold, wouldn't that simply cut in favor of, say, the motion to dismiss should have been granted, but that the plaintiff should be granted leave to amend because we all know and acknowledge that there's this information out there that the information was publicized and the only defect is in their failure to allege that particular fact. And maybe that is a material thing that it's got to be alleged or not, and you can't take judicial notice of it. But I don't know, that just seems, it's not going to get you all the way across the finish line if the only consequence would be, okay, you know what, it's a defect, but we know it's easily remedied. Yes, and we're not relying on that. Maybe we could, but there are two designations in this case. There's a terrorism designation by Israel. There was an earlier designation by Israel as an unlawful organization. It's the unlawful designation in 2008 that the district court found the link to. So is it your position that even if it was publicized, that would not by itself be enough to show a general awareness that providing, by providing financial services to IHS, it was assuming a role in Hamas's violent activities? Is that the argument? That's our argument, Your Honor, because Israel has these two levels of designation, as alleged in the complaint, unlawful and terroristic. The question here is participation in terrorism. A nation can designate an entity as unlawful for all kinds of reasons. So our submission is the designation as unlawful, assuming that it's okay for the district court to have found it, is not sufficient. This is along the lines that- I think that's a fair comment, but what about the 2000, because Judge Cogan also mentioned the 2010 demonstration in Accra in support of Hamas and the flotilla incident. So the flotilla incident, there are no allegations in the complaint that IHH's involvement in the flotilla incident was publicized in any public source. There is no public source cited for that information. So that suffers from the problem identified in Honickman, that while the flotilla was publicized, there was no allegation that the bank, there were sufficient public sources for the bank to plausibly be aware of IHH's participation in it. Okay. You're going to go on to the other two? Yeah, let me just finish up with this one. There's a US designation of the Union of the Good, which is sort of this umbrella fundraising organization. But the United States has designated some of the charities that are under that umbrella, not others. So we think that fact supports the idea that precludes a plausible inference based on Union of the Good. It's also interesting that if you look at the Israeli designation, it's not cited in the complaint, but we think under this court's decisions in DeFalco and Chambers v. that link, what Israel was doing was designating all of the Union of the Good entities. And so that, another reason why that Israeli unlawful designation cuts against, is that it's different from what the United States was doing at the time. So, turning to Islamic- Wait a minute, could you just say that again, because Israel designated more than the US? Well, I think A, it's just unlawful, but again- Right, and I get that. I mean, just like OBAC can designate people as terrorist organizations or international narco-trafficking syndicates. Exactly. You can do the Sinaloa cartel and you can do Hamas. And just the fact that you are sanctioned by OFAC doesn't say that you're a terrorist. Exactly. That's our principal argument. But your suggestion that if the US designated only some parts of the groups that fall under the Union of the Good rubric as terrorist organizations, I guess I'm not seeing why Israel's designation of all of them as unlawful would suggest that, well, maybe some of them were, I don't know, hypothetically narco-traffickers or something. Yeah, I think the fact that there's a conflict, we don't have to rely on this. I think the fact that the rationale was not the specifics of the organizations, but the Union of the Good affiliation makes it somewhat different from, shows a contrast to what the US is doing and makes it harder to defer plausibility based on- Well, what I was going to suggest though is that since here we're supposed to draw all plausible inferences in favor of the plaintiffs, I understand your inference and maybe you could argue that to the fact finder, but wouldn't there really, it seems to me that if there's overlap in the organizations that are being designated under whatever rubric, if the US has already said Union of the Good and certain number of its subsidiaries are actual terrorist organizations. And then you know that Israel has gone after the same group plus a few. I would think the inference is no, the Israelis have figured out more than the Americans have. And because the US has already said that most of these or some of these groups, including the parent organization, are terrorist affiliated. The inference should be, well, the reason the Israelis added a few more subsidiaries is because they've already figured out that they too are terrorists. Isn't that a plausible inference? Well, I guess I would go back and primarily rely on the unlawful versus terrorist distinction that we talked about first, because I do think the fact that Israel has two different levels, unlawful and terror, two different categories, unlawful and terrorism, your narco-terrorism example, narco example, sort of precludes relying on unlawful at all. I was sort of making an additional point, which I'm happy to recede from, which is that because the Israeli designation didn't focus on the specifics of the organization, but just union of the good itself, that that doesn't really by itself provide any additional juice in terms of plausibility. And I think if I could just- Go back to an unlawful designation, even if we assume your client knew about it. You're saying it's insufficient to support the required general knowledge that your client was, by its activities, helping to support the terrorist or the violent activities of the entity, right? That it was aware- I want to be sure I understand your argument. Yes, absolutely, Your Honor. That is absolutely our argument, that what the court has said is that it has to be aware that through the provision of terrorists, it was playing a role in unlawful activities here, the only unlawful activities around are terrorism. So it had to understand that it was playing a role in terrorism. Okay. So turning to the university, again, looking at what allegations are there of public sources, two of them are statements in articles that the university was, quote, a cultural symbol of Hamas and a main stronghold of Hamas. We think those generalized statements don't say anything about the university itself's link to terrorism such that, as the court put it, that it was so closely intertwined with Hamas that the court, that the bank- The 2007 Turkish paper that said there was a weapons cache on the university grounds. With respect to the weapons, of course, the article didn't say anything or the allegation doesn't say anything about how many and who they belong to. Well, yeah, you can complain all you want about the specificity. This is plausibility time. This is not court time. This is not trial time. This is plausibility time. This is a question about whether you had, quote, general awareness. I understand, your honor. I know you understand that. So the problem is that what you want to do is impose a proof standard and grid over that, and that's not what the law is. Your honor, I don't want to impose a proof- These are my iconic, didn't work, because they were talking about stuff that was known to the public after the fact. This is a question about, I just asked you about a newspaper article that says there was a weapons cache. And now you say to me, well, they didn't know it was there or something else. Well, those are all explanations for trial, not for plausibility. Somebody finds a cache of guns in somebody's house, their one plausible explanation is that they know that they're there. Isn't that plausible? I think it is a potential explanation. I guess what I would say is if- I don't think it's plausible that to attribute those guns to the university, and for two reasons, your honor. I think if there was a search of a US university and a large amount of illegal drugs were found at the university, I don't think that it would be plausible to infer that the university was in the drug dealing business or was using its own resources to support drug dealing. They have five articles, five articles, they do span 18 years, but they've got five articles linking the university to Hamas's militaristic activities. Reiterating what Judge Wesley said, in terms of plausibility at the pleading stage, why isn't that enough? Well, a couple of answers, if I may, your honor. Stepping back- Three of them especially, I think, are in Turkish news sources. Stepping back and looking at what the inquiry here is, the question really is what information is going to be sufficient to require a bank to expel an entity from the banking system? Because the consequences of wherever the court sets this rule will be that. And I think there's a serious question about whether five articles over 18 years, with some of which have extraordinarily generalized statements, or one-off incidents, should be sufficient. Because as the amicus brief- If this is not, the problem you have is that these facts then equal the rule of law if we go your way. And that then twists plausibility and confines plausibility to the new set of facts. These are all fact-specific cases. That's why Honigman sets a rule of law that says, after the fact stuff, just doesn't do it. Kaplan sets a rule of law that says, when you've got these kinds of interconnections, and the bank is, in essence, saying, that's the one complaint about the relationship, that's some Jewish explanation about these folks, and we're not going to adhere to it. Plus, suspending all the rules with regard to money transactions, that's the easy case. The hard case is, are those rule of law cases, or are those judgments that are made with regard to plausibility? Well, I think they're judgments about where the rule- Since plausibility is a legal standard, I think the court in those cases is saying, as a legal matter, these stand, and in Kaplan, these are sufficient. These allegations cannot add up to general awareness. These allegations cannot add up to general awareness. When he reads the newspaper and reads over the span of 15 years, five newspaper articles connecting the university to Hamas, and the presence of weapons on the university, a bank can't be, perhaps thought, a jury could not reasonably infer that they might think that they're connected. Or that the bank should know that they're connected to Hamas. I think that's right, Your Honor, because I think the consequences of where the court sets the plausibility standard will have dramatic impacts on the banking system. That sounds more like the jargon at the district court as to actual knowledge, as opposed to reasonable- No, because I think the plausibility standard is not really a low standard, Your Honor. What the court has said is, were these customers so closely intertwined with Hamas's violent activities that it's plausible A, that it's plausible B, for the bank to infer that by providing services to the entity, it was supporting, playing a role in terrorism. So- What do you make of IUG's inclusion as an unindicted co-conspirator in the Holy Land Foundation case? Because doesn't that color the way that one would expect the bank to then read the news articles? And even if one were to say, well, one article isn't enough, another isn't enough. Now you have this quite official allegation on the part of the United States government. And not just a press release, but I mean, this is an indictment, right? But no plausible allegation of public sources that would have brought that to the bank's attention, zero, Your Honor. And again, that's the sort of threshold question that this court has said in Honickman and Kaplan is, we have to have a system- That they didn't allege that the indictment was published? They didn't allege that the indictment was made public in a way it would have come to the attention of a bank in Turkey. I'm sorry, I mean, Sixth Amendment, right? I mean, don't we have to file indictments publicly? But again- No, I mean, really, isn't that- Yes. You're saying that it's implausible to infer that an indictment was filed on ECF and known to the world? I think it's certainly plausible that it was filed on, I'm not sure if there was ECF at that time. It was filed in some courthouse. It's a notorious case. I mean, this wasn't some trivial matter. This was a notorious case, and your client purports to know your customer practices. But Your Honor, if that were so, then it should have been easy for them to allege public sources that would have brought it to the bank's attention. When you say the United States government filed a criminal indictment, you also have to allege, and by the way, it wasn't secret? How did they know about it? I think, Your Honor, you have to allege that it was plausible that it would have come to the bank's attention. Again, the test we're setting here- Did the case go to the Supreme Court? Holyland? I don't believe that it did. I'm not certain, but I don't believe that it did. Sixth Circuit, okay. Well, courts of appeals are sort of well-known. But why- But there's, again, no allegation that the court of appeals opinion recited who the unindicted co-concurs. This is a bank in Turkey, and the rules that the court is setting, as the amicus brief says, are going to be the rules for banks around the world. What is reasonable? I think that that's taking us too far. We're not saying that your client, we're not holding your client liable. We're saying that this is enough to plead a plausible claim. Now, it may very well be that early in discovery, evidence will show that this evidence or these pleadings cannot support the inference that is being urged. But right now, we have to read them in the light most favorable to the plaintiffs. And that's what our concern is. So we have news stories that link them to Hamas's militaristic activities. We have them named in an indictment as connected with this kind of activities. And we have the designation of them, am I right, that's not applicable to all members. But you start to put these pieces together, and you view them in the light most favorable to the plaintiff. Why doesn't that suggest, well, they're not out of court yet? Not you're liable, they're not out of court yet. Well, a couple of responses, Your Honor. On the designation, the designation of one of the individuals in the leadership was a month before the attack. There are no allegations that there were transactions after the attack. So I think that designation- No, no, by itself, I understand it doesn't. But it came at the very end. But look at the totality of the pleadings. And the question is, okay, is it state a plausible claim? I understand, Your Honor, but I think if you look at the fact that two of these articles are generalized statements. The university is a cultural symbol. The university is a main stronghold. Yeah, on their own, they wouldn't give too much. But the question is, what do you do when you combine them with things like being named in a federal indictment in the United States as an unindicted co-conspirator? I mean, that's a pretty official statement. And being linked to the militaristic aspects. I mean, I agree completely that if everything that was written about them was, well, they are the cultural arm of Hamas. We would not have a concern. But you're highlighting the fact most favorable to your client. We have to look at the facts most favorable to the plaintiff. So help me out with those. I think, Your Honor, the only allegations that link the university to militaristic aspects don't have publicly available sources attached to them. They are statements. One is in a private- Is it in the 1997 Mideast Mirror article, the 2007 Amos Katbal article, the 2007 article in an unnamed Turkish daily, 2008 online Turkish news site, 2015 Turkish media reports. Those are the ones that I'm concerned about. Help me out. Your Honor, I think many of the articles that you just recited don't mention the university. They mention Hamas and other entities. But I think the only articles that mention the university are the two that I mentioned- I'll go back and read again. My notes indicate those were the ones that most favorably to the plaintiff linked the university to Hamas' militaristic activities. Again, I'll take a second look. And I think with respect to the guns, it is a single article. And I think the question is, is that attributable to the university? And again, stepping back, I understand Your Honor's point that this is just plausibility. But where the court sets this line is going to have big implications for the banking system because banks don't want to be subject to discovery in the U.S., especially non-U.S. banks. And so what's going to happen is that is going to set a quite low standard. If a couple of articles saying you're linked to Hamas culturally, there was one incident in 18 years of guns being found on campus, is enough to say stop banking this university, that sets an incredibly low standard with de-risking consequences for the banking system, which is these entities then aren't in the banking system. The ability of America and other countries to monitor what's happening decreases significantly. Let me ask you, if we let this case go to discovery and someone from the bank is deposed, who's involved in the no-year customer practices, and they're asked, did you know about the U.S. indictment? And the answer is yes. Does that further support the plaintiff's case? It's an indictment, Your Honor. It wasn't proven. I think I would take the position that that's not enough to get over the line. In terms of- You do know that by definition, that a group of 23 U.S. citizens found that there's probable cause to believe that that's true. That doesn't help? But they weren't indicted. I think it certainly would be better- They weren't indicted, but they believe that every allegation in the indictment is true. They have probable cause to believe that the statements are accurate. I mean, that helps them. It certainly helps them, Your Honor. But that's why I think what's critical here is that there's no allegation that a bank in Turkey, that there were any public sources that would have brought this to the attention of the bank in Turkey. It would have been the easiest thing in the world for the plaintiffs to allege the Sixth Circuit decision referenced this, and it was circulated widely. There were articles that talked about IUG and its affiliation. There's nothing. And so the question here is, what standard are we setting to trigger that discovery? Let's go to the last person. How about Mr. Yagamore? There are zero allegations in the complaint of any public sources. In any way, the bank ought to be wondering concerning him and the fact that he was in prison involving the murder of someone in Israel? Your Honor, there are no- That he was a soldier for months? There are no allegations of public sources for that information. I think that's why the court in Hanikman was so strong about saying, first we look at public sources of which the bank could have been aware. Then we take that information and decide whether it's sufficient. If there's no requirement of alleging public sources, then- There were no soldier customers in Hanikman, sir. And so there was no need to discuss that in Hanikman. That wasn't what the argument was about. These cases are fact specific, pleading specific. So there was no reason to discuss that. But you don't think it's enough when somehow the plaintiff knows it and is able to allege it? You don't dispute that it's true, do you? I don't know whether it's true or not, Your Honor. I guess I would look at what the court said in Hanikman about senior leaders of- I'm quite familiar with what it said. The court said there are, I understand, Your Honor, and the court speaking through you said there are senior Hamas leaders who are leaders of these three organizations. But because there's no public sources for that, the court said we're not going to rely on it. So again, focus- Paul, I think this comes up in your brief. The allegation about the crime for which Mr. Yagmur was sentenced, it didn't say anything about he had committed the murder in his capacity as a member of Hamas. Or that the exchange, in fact, was for him as a Hamas member. And that the allegation is that he, Mr. Yagmur, is Hamas's liaison with Turkish authorities. But there was no particular citation for which authority that, I think, forgive me if I'm mischaracterizing it. But I think you're essentially arguing that that last part is a conclusory allegation, that there's no meat on those bones. No meat on the bones, and no public sources that would have brought that information to the attention of the bank. I'm concerned with that is, the fact that there was no public information about his abduction and killing, that he was part of the main swap, that I find not very persuasive. I had thought your argument was going to be that between 2011, when he's released, and 2015, when these events happened, there's no information linking him to Hamas's terrorist activities. I guess we're supposed to think he became a diplomat. Is that the argument? I think there are no, again, I don't mean to be repetitive. But since the court has framed the question as what are the public sources that would have given the bank the information, or knew or should have known. There are no public sources, as your honor says, for what he was doing in Turkey, whether he was a representative of Hamas. There's just nothing to support that. I think they allege that he was a representative of Hamas, that he was Hamas's liaison with Turkish authorities. But as I said, they don't point to anything that suggests that his activities in that capacity involved promoting violent activities. But I'll ask the plaintiffs about that. I think that's an additional argument, your honor. But I do think the predicate of how was the bank to, what public information was there that would have led the bank to know that he was affiliated with Hamas in Turkey, there isn't any. Notorious, it's notorious. I mean, you're saying they don't get to ask your liaison people who do know your customer thing. Did you know that Mr. Youngmore was part of a notorious prisoner exchange? I think, your honor, if they have a- If they say no, we'll see what plaintiffs want to do then. Your honor, I think stepping back, the problem is discovery is not that targeted in today's world. And so once discovery happens, it's a very broad burden. And that is why banks will say, we don't really want to be in that world. Therefore, we are going to have to- We know why you don't want to be in that position. Can I ask you, I know we've kept you up considerably past your time, and I appreciate your taking that time. But I would ask you to spend no more than two minutes on the substantial assistance prong. And I don't think there's any need to talk about the knowingly, because I think that if we were to conclude that the general awareness was satisfied, that would seem to go to the knowing prong of knowing and substantial assistance. But I understand that you have some distinct arguments you'd like to make about that knowing and substantial assistance prong. And again, I don't want to keep you up too long, but just a couple minutes, if you have any key point you wanted to make on that. Sure, let me, I'll be very quick, your honor. I think the first factor, the nature of the assistance, Halberstam says, look to the importance of the aid to the injury causing act. This is quite different from Kaplan, which is the only sort of metric we have. Where the FTOs acknowledge relationship and the fact that one of the customers was supporting the families of terrorists, obviously was a much closer connection than the allegation here, which is there were banking transactions with these entities and the allegation is just really hundreds of thousands of dollars. So that turns to the sort of amount and type of assistance. In Kaplan, again, recognizing that that doesn't necessarily set a floor, the violations of the banking regulations allowed $2.5 million a week to flow without the identification of the customers depositing cash that would otherwise have been required. That's very substantial. A, there are no banking regulation violations here. B, the amounts of money alleged are considerably different. And again, the fact that one customer was directly linked to paying for the families of martyrs in the language of the name of the organization is quite different from what's present here. Did you move on substantial assistance below? Yes, we did, your honor. The district court did right on it though, right? I think he did, your honor, because one of the problems with the district court, one of the problems is that the district court sort of first conclusion was that satisfying prong one satisfied prong two. Okay, great. Yeah, that's fine. So thank you very much, and believe it or not, you've actually reserved three minutes. We will not be as, we will not be going beyond the red line of rebuttal. Before we start with the appellate, can I just ask the courtroom deputy for one quick second? I just have a housekeeper. That's fine. Sorry about that, please proceed. Good morning, and may it please the court. I'm Gary Olsen on behalf of the Hankin Plaintiffs. I think we agree at this point, our adversary agrees with us on the legal standards. So the question is really just whether as applied to the specific allegations in the complaint, the complaint satisfies that standard. And again, I'd like to just briefly go through some of the allegations that Mr. Pincus outlined and sort of place the emphasis, if you will, where we think it belongs. And if you don't mind, when you do that, much as we did with your adversary, if you could be careful to focus on the distinctions among the various customers. Because as we've already shown, the specificity of the allegations with respect to IHH, as opposed to IUG, as opposed to Mr. Is it Yaghmor, might be significant. Absolutely, your honor. So first of all, with respect to the Islamic University of Gaza, I think a little context is useful here. So first of all, the university, as the complaint states, was established, founded by Sheikh Yassin, the iconic founder and spiritual leader of Hamas. Can I stop you right there and say, what's the basis of that knowledge? And do you allege that basis in your complaint? We don't specifically allege a basis for it, but it's basically a well-known fact in the world. That Mr. Yassin has founded the university along with the rest of the Hamas leadership. To get to what might be a concern here. If it operated solely as a university, offering various courses and all that, I don't think you would be able to make a claim here. It's that your allegations that it doesn't operate only as a university. So I think you're going to have to focus on those, because that's what would support your claim that the bank was generally aware that by providing financial services to the university, it was assuming a role in Hamas's violent activities. So focus us on those. Yeah, absolutely, your honor. The point of beginning with Sheikh Yassin is to just provide the broader context of those allegations. Because it's also worth noting that as of 2007, Hamas had taken over the entirety of the Gaza Strip. So we're talking about an extremely high risk jurisdiction, even before we get to the specific customer involved. This is a jurisdiction which, due to a sort of civil war, was taken over by a foreign terrorist organization. So at that point, Hamas is in control of everything going on in the Gaza Strip. And banks around the world, of course, were aware of that. Now we get to your honor's point about the university and its actual function. So the complaint says in paragraphs 156 and 159 that the university was used as a primary recruitment tool for the Kassam Brigades, and that it was used to store weapons on its campus, and used laboratories to develop and manufacture weapons. That's from paragraph 159. And then as mentioned earlier, in a 2007 article in the high circulation Turkish daily, Hurriyet, it reported on a raid by the Palestinian authority of the university, which yielded a weapons cache. So certainly, if this complaint had been filed before, I'd rather have filed after Kaplan and Honeckman, we certainly would have added another 10, 15 newspaper articles about the Islamic University of Gaza and its links to Hamas and other raids and weapons seizures and so forth. But again, for purposes of plausibility, the issue is whether the university, as your honor just said, is intertwined with terrorist activities. And using the university to recruit, using it to store weapons, is sort of paradynamic of a terroristic activity and usage. Now there was a designation, there's also an allegation, I think it's a, I think, paragraph 185 of your complaint, about the relationship of the head of the university's supervisory board and his designation by the treasury department as a senior Hamas fundraiser. But that's only one month before the attack, is that correct? That is. However, it's also important to note that the complaint alleges that the account at the bank was controlled by a Mr. Kudri, who was in fact a minister in the Hamas government. And he was also on the board of directors of the Islamic University. So again, from a know your customer standpoint, setting aside that he's a minister in a Hamas government, he's a politically exposed person in the language of the banking world. So again, yet another flag that you're dealing with an unusual customer. And keep in mind, this is a account not in the Gaza Strip or for a Turkish university, but for a Gaza university holding an account in Turkey. So all of those things coupled together demonstrate plausible allegations that this is both connected to Hamas and to its violence. Your Honor, I think earlier mentioned the unindicted co-conspirator list from 2007. And of course, IUG was on that list for precisely the reason stated in the complaint. It was the flagship organization of Hamas. Can I just ask you, I don't have that paragraph. Which paragraph in the complaint did that appear in? One second, Your Honor. And then my next question is, are they, could you just remind me, do you allege there that they were listed in the indictment as unindicted co-conspirators? Or was this, how did you allege it, that it came out in a bill of particulars? Or how did you allege that this comes out? It's paragraph 158, JA 38, and the precise language says, on May 29th, 2007, the United States Department of Justice identified the Islamic University of Gaza as one of the entities that were part of Hamas' social infrastructure. And the list of unindicted co-conspirators in the criminal case of USV Holy Land Foundation and the Fifth Circuit. So you don't actually allege that that list appeared in the indictment. You just said that the Department of Justice identified them. Because sometimes unidentified, unindicted co-conspirators don't appear in an indictment, right? They appear in a subsequent disclosure in the criminal case. Right, the unindicted co-conspirator list was filed, as your honor alluded to, on ECF. But it's a separate document, not as part of the indictment. Correct, and I believe so. And that's just your representation to us here, that's not alleged in the complaint. Correct, you just heard what was alleged in the complaint. May I be clear on that, because I'm a little confused. So the university was an unindicted co-conspirator, or it was given some more vague description as part of a social infrastructure in a list of unindicted co-conspirators? Was it an unindicted co-conspirator? Yes, it was an unindicted co-conspirator. Okay. And to be clear, the Holy Land Foundation case in Texas involved Hamas social infrastructure organizations that the defendants were convicted of providing material support to. Well, let me ask what I'm supposed to make of being part of a social infrastructure. You allege everything from that the university was a source of recruitment, that people were recruited into Hamas's ranks from the university. That's different from whether or not the university itself was involved in some of Hamas's violence. The storing weapons comes closer to that. What am I supposed to make of an allegation in an indictment that it was part of the social infrastructure? So Hamas obviously has multi-faceted purposes. And- Is it your position that any entity associated with Hamas, the providing banking services for any of them implicates the bank in the violent activities of Hamas? Well, this actually came up in Honickman, and the court made clear that the closely intertwined requirement is there. So, for example, I think your honor gave this example in Lindy, citing the facts of Holder versus Humanitarian Law Project. There, the NGO was proposing to give assistance that technically was material support to a foreign terrorist organization. But it was advice on de-conflicting, how to join UN bodies, this involved the PKK and so forth. And this court has said that kind of activity might violate 2339B, the material support statute, but it wouldn't be enough for general awareness of a role in illicit or tortious activity from which, and this is the key part, violence or terrorist acts are foreseeable. But where you have organizations, and almost all terrorist organizations, when they have sort of a social welfare component, also have multiple hats. And so, for example, the Martyrs Foundation in Kaplan also ran hospitals. The key question is whether there is evidence specifically tying it to the violent part. Terrorist organizations don't get off the hook, and their aiders and offer classes in English literature. If they're involved in weapons storage and manufacture, if they're using the facilities, and the university is used to recruit operatives to the military wing of the organization, that should be sufficient, especially, of course, for pleading purposes, but also, ultimately, at trial, if you can prove that they are, in fact, doing those things. Okay, so in addition, and I think as Judge Wesley pointed out, unlike Honickman, here there are articles that predate the attack in question that identify on multiple occasions the Islamic University of Gaza as a stronghold of Hamas, etc. So there are notices of events, and of course, although it's not in the pleading, it's worth noting that there are many others that were not cited. So if this case were not here under extraordinary circumstances in 1292, and this was on a motion for reconsideration on a first complaint, if the court thought, you know, it needed another three articles or five articles or whatever it was, we would simply have to amend. But we think the allegations here fall in the continuum, unsurprisingly, north of Honickman, but south of Kaplan, if you will. Oh, so you hadn't had the chance to replead if you had been confronted with a dismissal? Right. We won below, and this was taken up. Right. Okay. That is the idea, because in the meantime, Kaplan came out, which provided more guidance. Right. And now I think it's clear that the legal standard below, of course, the defendant had different arguments to the district court that were pre-Kaplan. But I think as we stand here today, and as I hear Mr. Pinkus, we don't really disagree. Well, because the district courts were taking general awareness to be nationally new. Right. And it took a while to sort that out. And they were having difficulty kind of taking the Halberstam grid and putting it onto their types of cases. It's kind of unusual for Congress to tell us to use a particular case to understand a legal principle, but that's what Congress did. Right. That's correct, Your Honor. And so now that we have the benefit of Halberstam as applied in the terrorism context in two cases that are sort of on this continuum, we're really just talking about specific allegations and which ones are sufficient. And of course, it's a very fact-intensive question, as the court has previously noted, where you're weighing like a mixture of different kinds of facts that cumulatively either do or don't add up to general awareness. How about the relationship of the fellow who was designated and the supervisory council, you allege the relationship. Is there, again, are you relying on the fact that this is generally known as opposed to that there's not a specific article that discusses that relationship? Yes, I think the short answer is yes, but when I say generally known, it's a little bit different than Sheikh Yassin founding the university, which is sort of a textbook example. No, I'm talking about the supervisory board, the fellow who's later designated just a month beforehand. Right, so here I would say that we probably got that information from the university's own website or other materials that they've published rather than it being sort of widely known in the world. So I wouldn't suggest that that's sort of something that every person on the street in the Gaza Strip necessarily knows. Certainly the former, the founding of the university by Hamas is well known. And in fact, we actually quote a Hamas operative from 1993 who was being wiretapped by the FBI discussing the university and saying, this is an organization that everyone knows belongs to us. Can you take a minute to address the allegations regarding Mr. Yagmor and how you have alleged, if you have alleged, that this was publicly known? So I think there are really two parts. One is the question of the prisoner swap. What have you alleged that the murder that he committed was somehow Hamas related? And that it was somehow publicly known that when he was released, it was a Hamas swap. And then with respect to your allegation that he served as the liaison with Turkish authorities. How is that not a conclusory allegation? Which authorities, liaison, how, when, how does anybody know this? because again, with other things, you have news articles or you have other sources that may or may not be sufficient. But at least you suggest how this may have come to the bank's awareness. But with these, how do you make any allegation? I get the idea that maybe the idea that there was a prisoner swap or there was a murder could be well known. But do you allege anything saying why anybody would have known that was linked to Hamas? We don't, your honor. I think, to be honest, that's our weakest allegation of the three. That's not to say that on amendment there aren't actually articles about Mr. Yamgur's role in the murder of the Israeli soldier and about the prisoner swap and so forth there are. But in terms of what's strictly in the complaint, the thing that sort of has to be inferred, if you will, in the light most generous to the plaintiff, is that you have this famous prisoner swap for this prisoner amongst 11 others, or including him, 11. Turkey agreed to take them, and then he joined the Turkish offices of Hamas, which operated openly as the complaint specified. And your view, I take it, would be as if we found those allegations to be insufficient that in light of Kaplan, you think you should be afforded an opportunity to do a major complaint with respect to. I suppose with respect to any of your allegations, but certainly with respect to Yamgur. Sure, in fact, this was our first complaint on which we prevailed, so we've never had an opportunity to amend. Again, I don't- You've never had a reason to ask to amend because you won't. Correct. Well, let me ask you, though, so that we can pursue this. Are you suggesting that if a bank knew that Mr. Yagmur had participated in this 1994 killing of an Israeli soldier, and that he was the subject of the swap? Now, let's put aside for a minute the Hamas liaison. Just the two facts, that any bank that afforded him an account would be guilty of providing support here to terrorism? Well, I think putting aside- Basically, what it would be saying is that the man cannot have a bank account. No, I don't think that's correct. I didn't think that's what you are arguing. So then we get into the Hamas liaison, which if I understood you correctly, you've just conceded you have not so far pleaded that that was publicly known. Correct. Well, I would say, let me amend that a little bit, Your Honor. I think to the extent that Hamas operates openly in Turkey, that it has offices in Turkey, and that its officials not only operate freely, but meet with the president of Turkey and with Turkish officials regularly, it's not unreasonable to infer that his role is publicly known in a way that he would be essentially similar to a politically exposed person. But I don't think you've alleged that in their dealings with the Turkish government, Hamas operatives are pursuing the violent activities of the entity. Is that right? No, that's not correct, Your Honor. We actually- We do have allegations in there concerning the fact that the offices of Hamas in Turkey are used to plan and fund terrorist attacks in Israel. And that's sourced to what? That's a good question. Okay. In any event, you're not so much pressing that we should allow this claim to go forward as you are asking for leave to amend this one? As to Mr. Yamgur, yes. I would also say that, again, with respect to Mr. Yamgur, the issue is if he were simply a ex-felon, that might make him a higher risk customer, someone worthy of higher enhanced due diligence. But the key ingredient is that he remained a member of Hamas and continued to operate on their behalf when he had the account. Okay. Let me turn finally to IHH, which, as noted earlier, was a constituent part of the Union of Good. And just to jump off from where Mr. Pincus noted, the Israeli designation of IHH as an unlawful organization in 2008, that's paragraph 147 of the complaint, it states that the designation itself stated that IHH, quote, helped directly finance the activities of Hamas's military wing, end quote. So whatever the distinction in Israeli law between unlawful organization and terrorist organization, and obviously IHH was designated as both, the designation is... But not before the attack, right? Yes, this is before the attack. Yeah, this is 2008. And that 2008 designation specifically says that the IHH finances the military wing of Hamas. So, again, closely intertwined with... Just a reminder, is that contained in the allegation in the complaint or is that only if we look at the link? No, it's in the allegation. Which paragraph? 147, page JA... 36. And that's the 2008. And let's be clear, the United States government found similarly about the Union of Good that they, quote, diverted charitable donations to support Hamas members and the families of terrorist operatives. Which is very similar to the functions of the Martyrs Foundation in Kaplan. IUG was... I'm sorry, IHH was part of the Union of Good. Its operations were obviously in support of Hamas and publicly so. Let's be clear, there are six different allegations of public events in which IHH participated, in which they either supported Hamas in a rally or where Hamas senior leaders thanked them for their support in meetings in the Gaza Strip. And just some examples from paragraph 138, IHH funded a Hamas mass wedding. In 2008, an IHH delegation met with Ahmed Bakr, one of Hamas's most senior leaders and chairman of its council in Gaza and pledged further financial support. That's paragraph 141. I think Mr. Pink's main argument on this was that you haven't pleaded how the bank would have known these facts about the public disclosure of all of this information. Right, but the point is that when you're pleading something like the question of whether IHH puts itself out as a Hamas supporter, one reasonable inference from these kinds of facts is that they're not hiding it, that it's something they do openly. And when you rally and meet publicly on multiple occasions with Hamas leaders, when you engage in rallies in Turkey in support of Hamas, one reasonable inference from that is that you in fact are connected to and do not conceal the fact that you're connected to Hamas. And let's remember that even in Kaplan, the allegation about websites and Hezbollah acknowledging the Martyrs Foundation, there were examples of the kinds of media it appeared in the Hezbollah website and the like, but not specific citations to that. That was separate from the articles that dealt with the Martyrs Foundation and its general support for suicide bombers or its connections to Hezbollah. So again, I think those allegations coupled with the events of the flotilla, with the Union of Good Designation, with the designation of IHH itself by Israel, you take that in its totality and you have an organization that clearly openly supports Hamas and that multiple governments have found supports the military activities of Hamas. Okay, thank you very much. Mr. Pincus, you have reserved two minutes for rebuttal, so this time will be pretty tight with the timing. Yes, Your Honor, a couple of points. Just with respect to the quote in paragraph 147, that IHH that my friend referred to, that quote does not appear in the document that is at the link that the district court identified. I think the court can look at that document because the allegation is integral to the complaint and that allegation may be some, that statement may be somewhere else, but it's not in that document. Which paragraph? 147, Your Honor. Thank you, Mr. Pincus. My friend, with respect to IUG, also referred to paragraphs 141 and 138. No publicly available sources for those. The same with respect to IUG for the allegations in 156 and 159. With respect to the university, I think the key point that Judge Raji made, which is it has legitimate functions and so the question here is whether it was using its financial resources to support, whether the bank had information available to it that would have known that it was so, the university was so intertwined with terrorist activities that it was using the bank services to support terrorism and really the only link between the university and militaristic activities, once those paragraphs that don't have public sources are taken out of the equation, is the fact that the guns were found in one article at one time and our submission is that that's not sufficient. Just to agree with respect to repleting with my colleague, obviously if this complaint is found insufficient, it would be totally appropriate for the plaintiffs to have a chance to replete given the new standards. All right. Thank you very much. Thank you. Both sides. It was very well argued and very helpful. So thank you all for that. We will take the case under advisement and with that we will ask the Corporate Deputy to adjourn.